# United States Court of Appeals
# for the Federal Circuit

---

**VICTORIA V. SALMON,**

*Petitioner,*

v.

**SOCIAL SECURITY ADMINISTRATION,**

*Respondent.*

---

2011-3029

---

Petition for review of the Merit Systems Protection Board in case no. DC0432090732-I-1.

---

Decided: December 9, 2011

---

PHILLIP R. KETE, of Washington, DC, argued for petitioner.

HILLARY A. STERN, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRIAN M. SIMKIN, Deputy Director.

---

Before DYK, CLEVENGER, and REYNA, *Circuit Judges*.

CLEVENGER, *Circuit Judge*.

Victoria V. Salmon, a former service representative with the Social Security Administration ("SSA"), has asked this court to review the final decision of the Merit Systems Protection Board ("the Board") affirming SSA's removal of her from her position. *Salmon v. Soc. Sec. Admin.*, No. DC-0432-09-0732-I-1, slip op. (M.S.P.B. Sept. 30, 2010) (nonprecedential) [hereinafter *Board Opinion*]. Because we find no error in the Board's decision, we affirm.

I

Ms. Salmon worked for SSA as a service representative. Her duties were to assist SSA beneficiaries and others with questions about SSA programs and procedures in person, by telephone, and by written correspondence.

The main events of this case began in late 2008 and ended with Ms. Salmon's removal in mid-2009. At the outset of that period, in September 2008, Ms. Salmon met with her supervisor and received her Performance Plan for 2009. This was pursuant to SSA's employee performance review system, "PACS" (Performance Assessment and Communications System). *See* PACS, J.A. 222. The Performance Plan, which Ms. Salmon signed, set forth various performance targets for Ms. Salmon in the coming year.

As the year proceeded, however, Ms. Salmon was on several occasions called into further meetings with her supervisor. At these meetings, the supervisor informed Ms. Salmon that her work was considered deficient. Ms. Salmon traveled through escalating periods of review and evaluation as set forth in PACS. During a forty-day

"Performance Assistance" period and a four-month "Opportunity to Perform Successfully" ("OPS") period, a mentor attached to Ms. Salmon observed her work, noted deficiencies, gave corrective instruction, and reported back to Ms. Salmon's supervisor. In between the two periods, Ms. Salmon's supervisor relayed to Ms. Salmon the mentor's observations and conclusions, noted where Ms. Salmon's performance was deficient, and gave instruction about what ought to have been done in each observed situation. But at the end of the OPS period in July 2009, the supervisor concluded that the situation was beyond repair. With the consent of the local District Manager, the supervisor removed Ms. Salmon from her position.

Ms. Salmon appealed to the Board. The Administrative Judge assigned to the case affirmed the removal. Init. Dec., *Salmon v. Soc. Sec. Admin.*, No. DC-0432-09-0732-I-1, slip op. (M.S.P.B. Feb. 12, 2010), *petition for review denied*, slip op. (M.S.P.B. Sept. 30, 2010). The Board agreed. *Board Op.* Ms. Salmon timely petitioned this court for review. This court has jurisdiction over petitions for review of Board decisions. 5 U.S.C. § 7703(b)(1); 28 U.S.C. § 1295(a)(9).

II

This court reviews final decisions of the Board to see if they are arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Sandel v. Office of Pers. Mgmt.*, 28 F.3d 1185, 1186 (Fed. Cir. 1994). Our review of the Board's legal determinations is *de novo*. *Sandel*, 28 F.3d at 1186.

## III

Ms. Salmon argues that the PACS system, as applied to her, is unlawful. Her attack has three aspects. First, Ms. Salmon argues that PACS fails Congress's requirement that federal agencies' performance appraisal systems evaluate employee job performance on the basis of objective criteria "to the maximum extent feasible." Second, she argues that the performance standards applied to her did not meet statutory requirements for employee participation in their development. And third, she argues that SSA failed to carry its burden to show that its use of PACS was approved by the Office of Personnel Management.

## A

Ms. Salmon's main allegation is that SSA used unlawfully-subjective criteria to evaluate her performance. The relevant statute reads:

> (b) Under regulations which the Office of Personnel Management shall prescribe, each performance appraisal system shall provide for—
>
> (1) establishing performance standards which will, to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria (which may include the extent of courtesy demonstrated to the public) related to the job in question for each employee or position under the system;
>
> (2) as soon as practicable, but not later than October 1, 1981, with respect to initial appraisal periods, and thereafter at the beginning of each following appraisal

period, communicating to each employee the performance standards and the critical elements of the employee's position;

(3) evaluating each employee during the appraisal period on such standards . . . .

5 U.S.C. § 4302(b)(1)–(3) (2006). Ms. Salmon emphasizes that subsection (b)(1) imposes a duty on agencies to evaluate employee performance using "objective" criteria "to the maximum extent feasible."

Ms. Salmon points to her 2009 Performance Plan as purportedly failing to satisfy section 4302(b). The plan laid out four "critical elements" of Ms. Salmon's position: Interpersonal Skills, Participation, Demonstrates Job Knowledge, and Achieves Business Results. Each of these "elements" was accompanied by seven to nine elaborating bullet points. For example, element 3 ("Demonstrates Job Knowledge") included bullets such as "Effectively applies knowledge and skills to meeting customer needs and expectations"; "Contributes to the success of organizational operating plans by producing high-quality work results"; and "Maintains current knowledge of SSA programs, procedures and systems through office training and review of policy and procedural updates, such as daily PolicyNet postings." Salmon 2009 PACS Performance Plan, J.A. 95, 96. Ms. Salmon argues that these metrics, and others like them in the 2009 plan and the various memoranda chronicling Ms. Salmon's path to removal, are not sufficiently "objective" to meet the requirements of section 4302(b). She would prefer, for example, numerical standards—e.g., "no more than $x$ errors in time period $y$"—or some other standards of more exact application.

This court addressed the requirements of section 4302(b) in *Wilson v. Department of Health & Human Services*, 770 F.2d 1048 (Fed. Cir. 1985). There, as here,

removed employees argued that the standards applied to them were insufficiently objective. In addressing the employees' arguments, this court specifically rejected the suggestion that the term "objective criteria" in subsection (b)(1) binds the government to use only "precise quantitative or numerical standards." *Wilson*, 770 F.2d at 1052. *Wilson* required only that "a standard should be sufficiently precise and specific as to invoke a general consensus as to its meaning and content." *Id.* Here, we think that the standards themselves were sufficiently objective. Ms. Salmon argues that the standards were not sufficiently objective because "if [a] quantitative standard . . . is more based on objective criteria than [a] non-quantitative standard, the former must be used." Pet. Br. 41. But as we said in *Wilson*, the statute does not require quantitative standards. It requires only that the standards be "sufficiently precise and specific," which, as explained below, they are here. 770 F.2d at 1052.

Further, *Wilson* clarified that the section 4302(b) analysis is not confined to the written standard. The efforts of a supervisor to instruct the employee on how best to satisfy the standard also mattered. By such instruction, "[t]he standard was [ ] fleshed out and implemented in detail." *Id.* at 1056; *see also DePauw v. U.S. Int'l Trade Comm'n*, 782 F.2d 1564, 1566 (Fed. Cir. 1986).

In this case, Ms. Salmon's supervisor gave direct, precise feedback on the deficiencies in Ms. Salmon's work and clear instruction on how to remedy them. In February of 2009, both women signed an OPS memorandum, prepared by the supervisor, that set forth over thirty case studies, each describing some error in Ms. Salmon's conduct and stating what should have been done. And, as discussed, the supervisor provided Ms. Salmon with a mentor to provide guidance and correction during the subsequent OPS period.

In light of this record, we see no error in the Board's conclusion that the performance standards applied to Ms. Salmon met the requirements of section 4302(b). Those standards, by which we mean the 2009 Performance Plan in light of the supervisor's efforts at instruction, were clear, precise, and specific enough to be "objective." In other words, they were sufficient to invoke a general consensus among reasonable people in Ms. Salmon's position as to their meaning and content. We therefore find no basis for reversal in the standards' level of objectivity.

B

Ms. Salmon next argues that SSA, in its adoption of PACS, contravened the "employee participation" requirement of section 4302(a):

> (a) Each agency shall develop one or more performance appraisal systems which—
>
>> (1) provide for periodic appraisals of job performance of employees;
>>
>> (2) encourage employee participation in establishing performance standards; and
>>
>> (3) use the results of performance appraisals as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, and removing employees.

5 U.S.C. § 4302(a) (2006). Ms. Salmon argues that PACS "did not provide for and did not result in employee participation [in establishing performance standards]," and from this argues that its use by SSA is unlawful. Pet. Br. 59. Throughout her brief and at oral argument, Ms.

Salmon emphasized her belief that section 4302(a) required SSA to solicit and consider an employee's input in the development of her own performance standards. She points out the absence of evidence in the record that SSA ever allowed employees to participate in the establishment of performance standards under PACS, including the standards associated with her own position. *Id.* at 16.

The government responds that Ms. Salmon misunderstands the meaning of section 4302(a)'s "employee participation" requirement. It denies that this section required SSA to guarantee that "each individual employee could participate in the development of the performance standards that would apply to his or her position." Gov't Br. 20. The government reads the section as requiring only that employees have input into the larger process under which specific standards would be developed and communicated. The government points out that the PACS system was proposed to the American Federation of Government Employees (AFGE) in 2005 and was approved as part of the collective bargaining agreement between SSA and AFGE. *See id.* The government argues that this satisfied section 4302(a).

Congress tasked the Office of Personnel Management with promulgating regulations in this area. 5 U.S.C. § 4305 (2006). The OPM regulations place final authority for performance standards with the agency:

> *Performance standard* means the *management-approved* expression of the performance threshold(s), requirement(s), or expectation(s) that must be met to be appraised at a particular level of performance. . . .

5 C.F.R. § 430.203 (2011) (second emphasis added). The legislative history also strongly suggests that this was what Congress intended:

> The section [§ 4302] specifically encourages employee participation in establishing performance objectives. Experience has shown that doing so motivates employees to accomplish the objectives. Management will have the ultimate responsibility under this section, however, to establish the performance standards.

S. Rep. No. 95-969, at 41 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2763. From these, we agree with the government that, while SSA has an obligation to seek employee input into performance standards, the precise means of such input, and the use to which that input is put, is within SSA's discretion.

In this case, as the government points out, PACS was expressly endorsed in the national agreement between SSA and the appropriate union of government employees. *See* 2005 SSA/AFGE Nat'l Agrmt., art. 21, J.A. 249 (excerpt). PACS states that employees will be assessed on the identical performance elements at issue in this case: Interpersonal Skills, Participation, Demonstrates Job Knowledge, and Achieves Business Results. *See* PACS, sec. 5.3, J.A. 223, 224. PACS also states that employees will be issued Performance Plans by their supervisors prior to the start of any appraisal period, at which "expectations" will be discussed and documented by the supervisor. *Id.* secs. 5.7, 5.8, J.A. at 230. All this was done in this case.

Assessing these documents, we agree with the Board that PACS satisfies section 4302(a)'s requirement for employee participation. We therefore find no grounds for

reversal on the basis of inadequate employee participation.

C

Finally, Ms. Salmon contends that SSA failed to demonstrate that its use of PACS had been properly endorsed by OPM. *See* 5 U.S.C. § 4304(b)(1) (2006) (requiring such approval for "each performance appraisal system developed by any agency").

In 1995, shortly after SSA was spun off from the Department of Health and Human Services, it submitted its performance appraisal system to OPM. *See* 1995 OPM Form 1531, J.A. 139 *and* 1995 SSA Performance Appraisal Description, J.A. 141. OPM responded by letter, "We have reviewed the system and determined that it meets the requirements of 5 CFR part 430 subpart B. The system is approved." Ltr. fr. D. Hausser, OPM, to R. Pierce, SSA (Sept. 29, 1995), J.A. 150. SSA began using PACS for employee performance appraisal ten years later, and Ms. Salmon contends that PACS was not covered by OPM's 1995 approval.

In *Adamsen v. Department of Agriculture*, 571 F.3d 1363 (Fed. Cir. 2009), *modifying* 563 F.3d 1325 (Fed. Cir. 2009), this court held: "If an agency significantly alters a previously-OPM-approved performance appraisal system, OPM review of the agency's modifications is necessary to achieve compliance with the basic purpose underlying the OPM-approval requirement." 571 F.3d at 1364. Ms. Salmon contends that PACS embodied such modifications; the government argues that PACS did not.

On the record before us, we agree with the Board that PACS did not change the obligations of SSA employees to such an extent that OPM re-review was necessary. The performance appraisal system description that SSA gave

OPM in 1995 was a framework-type overview, not a detailed implementation. PACS further developed the details of SSA's performance appraisal system, in a manner consistent with the outline provided to OPM.

The regulations promulgated by OPM embrace this approach, wherein OPM approves a high-level plan and the agency fills in the details. *See* 5 C.F.R. § 430.203 (2011) (defining "appraisal system" as a "framework of policies and parameters" that must be presented to OPM for review, as opposed to an "appraisal program," which comprises "specific procedures and requirements established under . . . an agency appraisal system").

Ms. Salmon has shown no area in which PACS is materially inconsistent with the framework in SSA's 1995 submission to OPM. As far as we understand her, Ms. Salmon argues that PACS fails to satisfy the representations concerning employee participation that SSA made to OPM in 1995. As discussed *supra*, however, we do not adopt Ms. Salmon's view that "employee participation" requires that an employee participate in the development of her own performance standards. The 1995 submission stated, "While final authority for establishing performance plans rests with the appraising officials, employees and appraising officials should participate jointly in developing the plans." 1995 SSA Performance Appraisal Description, sec. VI.E, J.A. at 145. We thus conclude that SSA's negotiation of PACS with the employee union satisfied that commitment, as it satisfied the requirements of section 4302(a). *See AJ Op.* at 7.

Ms. Salmon also repeats her arguments that PACS departs from the 1995 submission because PACS fails to apply "objective criteria," but we reject this argument for the reasons already discussed. *Supra* sec. III.A.

Finally, Ms. Salmon points to a separate proceeding in which an official who helped develop PACS testified that until PACS' adoption, "there was [sic] virtually no criteria governing performance awards." L. Watkins, Tr., *Am. Fed'n of Gov't Emps. Local 1923*, No. BM-2006-R-0006 (Soc. Sec. Admin. Nov. 13, 2006) at 108:13–17, J.A. 157, 168 [hereinafter Watkins Tr.]; *see also Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1364 (Fed. Cir. 1998) (recognizing the Board's discretion to admit and use hearsay evidence). The official stated that, prior to PACS, SSA used a "pass/fail" approach, in which the distribution of performance awards posed something of a puzzle for supervisors and employees, as compared to PACS' "multi-tiered" approach, in which it was easier and more clear. Watkins Tr. 77:4–18, J.A. at 164. Ms. Salmon argues that this was a "significant change" in how performance evaluations were handled, and thus triggered a need for OPM review. We disagree. While PACS may have differed substantially from its predecessor program, we see nothing in the proffered testimony indicating that PACS was inconsistent with the 1995 submission to OPM. Indeed, the 1995 submission specifically states that implementing "appraisal programs" could use any of a variety of "summary levels" to assess employee performance, ranging from a binary "unacceptable/fully successful" metric to a five-tier system ranging from "unacceptable" to "outstanding." 1995 SSA Performance Appraisal Description, sec. VIII.C, J.A. at 147.

We therefore find no basis on which to reverse the Board's conclusion that SSA was not required to re-submit PACS to OPM for approval.

For the reasons stated herein, the judgment of the Board is

**AFFIRMED**

COSTS

No costs.